Okay, thank you. Mr. Eagle, whenever you're ready. Good morning, your honors. Lawrence Eagle, Breger Eagle, and Squire on behalf of the plaintiffs, Kwong Kwok. First, I'd like to thank the panel for allowing me to appear remotely. I appreciate, realize it's a burden on the court, and I appreciate it. The focus of my argument this morning will be on the court's holding that, viewed holistically, the complaint failed to plead facts that make the inference of Sienter cogent and at least as likely as any plausible opposing inference. The court below erred when it so held. The complaint and the briefing make a strong case that defendants made false and misleading statements and omissions during the class period, and that when the truth was revealed, the disclosures caused Fluidigm stock to crash and burn, and plaintiffs and other class members suffered damages. The district court's focus on the lack of motive allegations placed undue weight on the absence of stock sales, including one purchase, and the lack of importance of the company's need to fund operations as being a basis for motive allegations. But the focus here on motive allegations ignored some of the important considerations regarding Fluidigm as a company and its overall importance of mass cytometry to the success and ultimately to the story that Fluidigm had told the investing public. Fluidigm is a small company, the lifeblood of which was mass cytometry as the company was approaching 2019. Linthwaite, the defendants, and Jog were senior executives, Linthwaite being the CEO and Jog being the CFO. Both were considered to be intimately involved in the operations, knowledgeable about the sales pipeline, had access to sales data in October of 2019 and again in January, I'm sorry, 2018, and again in January 2019, showing that sales of mass cytometry products would decline in the second half of 2019. And that's critical because this was, the confidential witnesses here had direct knowledge, they met with, they provided documents to, and they had information clearly communicated. Counsel, was that a forecast that sales would decline or did they know that sales were going to decline? Did they know that sales had already declined? It's a combination forecast and already given the lengthy sales cycle for the mass cytometry products. It is effectively a six to nine month product sale. I think that the case involving City of Miami against RH Inc. is somewhat analogous in the sense that there is this lengthy product cycles and therefore when data that you would see concerning a projection or concerning a forecast would also be data that was real time data showing the decline and there was no way to sort of make it up. It's not like you could make those sales up three months later or six months later. So it was true, a forecast, but nonetheless a fact in terms of the six to nine month sales cycle. And I think it's important that the mass cytometry business was the growth story for the company. So why not reveal the truth? You don't reveal the truth here because the growth story gets shattered as it was under these facts. And we've got in the complaint, Your Honor, as you'll see, there is a summary of the revenue change between mass cytometry and microfluidics, the other business. And mass cytometry became what this company was about in its growth story and what both analysts were looking for and what the investing public was looking for. And its stock price reflected the fact that mass cytomics were positive and that it was the growth story for the company. So why not disclose that sales in the second half of 2019 are going to decline? The reason is exactly what happened. Because as soon as there became some concern that mass cytometry sales might decline, and that was in August of 2019, the stock price dropped 33 percent from $12 to $8. And then when it became clear that there had been a decline in mass cytometry sales in November of 2019, the stock price dropped another, well, at that point it had dropped already to $5 and another 50 percent to two and a half. In total. But counsel, since you're conceding that these were projections, how are they not subject to the safe harbor under the PSLRA? Well, they were not projections because they were, in fact, they were specific. These are, they had knowledge that those projections were false. It's different if they were just projections and they turned out to be false. But they knew, those were, while they continued to say that, well, they were false. Well, isn't the whole point of the safe harbor is to be hopeful and optimistic? So they're projections, so you can't know they're false until the future happens, right? And the whole point is that you're trying to, you're allowed to be optimistic about things. Understood, Your Honor. I think that this is not that case because here the six to nine month sales cycle made their visibility or their knowledge of what was going to happen in the second half of 2019. And there was, this was a forecast that continued throughout the class period. So at every moment, not only we say it was initially, it was initially disclosed in the October 2018 presentation that was made to both Jog and Linthwaite, it was also in January of 2019, they had weekly sales meetings, they had- Was the six to nine month sales cycle, was that publicly known? Did people know what had gone on for the previous six to nine months? The sales cycle being that it was a six to nine month sales cycle was not publicly part of their disclosure until later in the process. It was not something that somebody was warned that there's a six to nine month sales cycle projection in my opinion. It was, it was, it was not something that the public was factoring in. I think that if you look at the analyst questions, as soon as they're, and I think the analyst questions, you know, give you the real insight into what people are saying is, well, can you tell us what's in the backlog? Can you tell us, you know, what is your, what is your sort of, we see that you were 4 million off of your projections, what's it looking like? And at every time those questions were asked, the response was mass cytology sales are strong, the future is steady, there's no change in the trend. So there was the reassurance to invest in public, including in, in August of 2019, that is, that, that mass cytometry was going to continue in the upper trajectory that it had been up until that point and would continue and obviously was necessary for the company to continue to fund operations if it was going to raise additional funds. So, and what, projections were not accurate. I don't have the specifics, but I recall that that being the case that I think we considered it similar to our factual pattern as to where the company had, it had current knowledge that its projections were not going to happen. It's different when the projections turn out not to happen, but when you have current knowledge that they're not going to happen, that is not a projection. That's not a safe harbor case. That's a case where you know the facts and you're lying to the investing public. And that's, Judge Hamilton permitted you first to, to amend your complaint to, to address the deficiencies, which she noted, correct? Correct. And, and essentially you were given an opportunity to take this out of the safe harbor under PSLRA in terms of most of your allegations had been in terms of forward looking projections. Exactly. What are the non-forward looking projections that you contend that take you out of the safe harbor very specifically in terms of the view of the existing markets, for example? Where is, not even getting to the falsity question or scienter, just where is the, what are you specifically alleging was not forward looking or making projections or analyzing data? I think, and I, and I, and with respect to having the right to amend, I think we did amend, we did withdraw allegations concerning, concerning certain facts, but let me, let me start with, and this is in our record on page 91. And this is in February 7th, 2019, in which I assure you, this is not a situation where we burn backlog. This is dependent lengthways saying, really, we feel very comfortable with what we're setting up to come into the year. And we have certainly strong growth throughout the back half of the year in general. Now, he said they have strong growth in the back half of the year in general, but he knew because we, we have confidential witnesses said he got a doc. He got a report in, in October and again in January and that he was on top of sales meetings and communication. So he complained accurately, I think adequately alleges through the testimony of confidential witnesses that he knew that that was a false statement. Which part of it is false, that we're not, that they were not comfortable or that they had strong growth throughout the back half of the year? That they have strong growth throughout the, we certainly have strong growth throughout the back half of the year. That, that is a false statement because he knew that they didn't have strong growth. But this goes to my prior question. Was, was there growth through the back half of the year? Was, was, was that, was there anything there, public information? So not public information as to what their growth had been? Not for two, you're saying before it, this, this is a statement in, in February 19 of 2019. And the back half of the year was the second half of 2019. So there was no public information concerning what the. No, I think, no, I think that would be the strong, as I read that, that would be strong growth throughout the back half of the year. That would be 2018, wouldn't it? No, this is going, this is looking forward because it's what we're setting up to. We have, we have certainly strong growth throughout the back half of 2019. And he said this. Well, maybe, maybe I have to read the question. This is a question. This is a question from an analyst. And looking at the page, it was regarding the level of backlog. So the question from the analyst was, how is your backlog? And, and, and Linthway said, I didn't give you numbers, but they're talking about what they expect in the future, not what had happened in the past. And so I think that was clear from its context. Let me go on and talk about another one. And this is in May 2nd, 2019. Linthway again says, I'll fundamentally reassert what we said. We see strong and steady demand. We don't really reveal backlog numbers, but we continue to see very strong demand for our instruments. Again, the key, the key takeaway there is we're not going to have any declines, but they're projecting declines. And they know it's a six to nine month projection. And it's a six to nine month sales cycle. And they're not just. The problem with that statement is a strong, strong demand, right? That's somewhat puffery. How do you analyze what strong demand is? It doesn't say we're not going to have, it doesn't say that we're not going to continue to increase, you know, growth projections. Well, I think it does in the context. Look, I think if you're partially saying, if you're partially going to disclose to the public that we have strong demand, I think you're obligated at that point to say, but we have, but we see, but we're having, we see the trend of a decrease in our, in our revenue in the second half or sales in the second half of 2019. I think when you're conveying to the public, again, these are many times in response to questions from panelists who are trying to figure out, is your company on continue to grow or not? And I think that's, it's reflective. Look, you're, you know, you're trying to say, did the company know, or did, did the public know? I think what happened in November is critical. And I think the statements of the statements of the, you know, sort of, you sort of get the analyst statements. Maybe this is a Motley Fool's comment. It's not page 105, but it says, it says shares of Fluidigm fell more than 54% on Wednesday after the company reported third quarter results. The lab instrument developer, supposedly, supposedly the public thinks in the midst of growth spurt reported revenue decline compared with a year ago, period. Worse yet, the segment leading its growth trajectory started declining sales. Well, the disappointing results shocked investors and for good reason. And so I can reserve some time for rebuttal. Yes, I will. Thank you, Your Honor. Good morning, Your Honors, and may it please the court. I'm Ignacio Salceda on behalf of defendant of Helene's. This was the kind of case the Reform Act was intended to have dismissed at the pleadings. Here you have a company that issues financial guidance one quarter at a time. And it meets its guidance for the first quarter and for the second quarter of the class period. In the third quarter, it comes up short by all of 2%. A securities class action followed. The district court properly dismissed. And you can affirm on either an absence of an actionable false statement or the failure to plead a strong inference of fraudulence he entered. I'd like to begin with falsity as a number of the questions that the panel asked were about falsity. And yes, Your Honor, many of the statements challenged are puffery, strong growth, confidence, et cetera. This court, in many cases, has said that those are not actionable. Most recently in the McComb versus Align case, but there are others that are cited in the papers. And the law is clear. Puffery is not actionable. In addition, many of the statements are forward-looking. And as Your Honor noted, they are protected by the safe harbor for forward-looking statements. And the safe harbor has two prongs. It has three. One is immaterial. But that doesn't really come into play very much. Really, what we're looking at is whether the statements were accompanied by cautionary language or, if they're not, they're still protected unless the plaintiff can show that they were made with actual knowledge of falsity. It's in the alternative. And this court, in the Kutera decision and others, has made clear that it is in the alternative. And here, the company was very cautious. Its SEC filings were repeatedly talked about, its dependence on, its expanding line of business, its lengthy sales cycle, the fact that many of the — that these were expensive capital equipment decisions, and so customers took time, and those things could change. Can I ask a factual question? One of the statements at issue here is that Master Truman, its funnel on the whole is very deep. What is the funnel? What is that referring to? I believe it is a general statement, broadly, about the potential market opportunity. It is not a — I don't think it's a reference to a physical funnel that is in the device. I think it's about the very —  The opportunity. Again, that's puffy. It's akin to the statement that this court found in McComb versus Align about, quote, a huge market opportunity, great growth markets, et cetera. That's the puffery there. But you're right to focus on the safe harbor because the company had repeatedly cautioned about its variability in quarter-to-quarter results. In fact, it's the very first risk disclosure. It's on our supplemental exhibit, I think, page 53. And it repeatedly, during the conference calls, also talked about the risks. For example, Mr. Linthwaite talked about lumpy sales in the May call. In the August call, Mr. Jogg, the CFO, said that they're crossing a chasm now, and they're getting into the risk that customers might delay their purchasing. Mr. Linthwaite talked about the importance of government funding in the third quarter, which is the September 30 quarter. What's your response to your colleague's position that, you know, the safe harbor doesn't apply if you know the projection is going to be false? That's contrary to the language of the statute at this court's decision in Kutera. But beyond that, it assumes that the defendants knew that the forecast was false. They don't have a single internal document, a single forecast, which shows that the public guidance that the company gave was false. And, in fact, it would be very hard for them to do so because the company met its guidance for the first quarter, gave guidance for the second, met that guidance. For the third quarter, note that the guidance range was lower. It lowered it by a million dollars. Instead of 28 to 31 million guidance for the first quarter and the second quarter, for the third quarter it gave slightly lower guidance of 27 to 30 million dollars. It came up 2% short. It was about $26.5 million. That's after they adjusted their revenue downwards rate from 27 to 30 million dollars. Yes, the guidance they gave in August for the quarter, which ended September 30, so it was at the start of the quarter, they gave guidance of a range of 27 to 30 million dollars. They came up 2% short. They came up at 26.5. And that precipitated some stock loss at that point in time. Yes, it did, and we're here. But, Your Honor, Judge Boumet was correct in saying that the safe harbor is intended to protect forecasts. And this court has talked about the importance of that and that optimism is not a violation of the federal securities laws. And there's an extensive discussion in this panel, in this court's decision, in Wilkes v. Tesla, about the need to protect forecasts. And here, again, the company missed by 2%. Now, let me switch. And, indeed, at that same time period, the facts are, as the court noted below, the chief executive officer, Christopher Linthwaite, actually purchased additional shares himself in August of 2019. I know it goes to the Scientra issue, but he himself, even during that downturn, purchased stock. That's correct, Your Honor. Didn't sell. He purchased. He purchased with his own money. And this is although he already owned over 400,000 shares. And this goes to the Scientra point, which is an independent basis upon which the court can dismiss. There was no motive to defraud here. There was no motive to artificially inflate the stock price for a little bit of time. The individual defendants collectively owned over half a million shares of the company's stock. They didn't sell a single one. On the contrary, as Judge Bennett, you noted, Mr. Linthwaite, the CEO, bought some during the class period. So if they had intended to goose up the stock price artificially in order to cash out, well, that doesn't really make any sense because they didn't cash out. Is there a factual dispute on that? I think the opposing counsel argues that that was some sort of feign and, you know, that was, you know, not a real just to throw it off, you know, because it was a small amount of stock that it was purchased. Yes. And so, therefore, it was, you know, it was do we have to make a factual, is there a factual dispute on what the, how we read that is my question. No, there's no factual dispute that the acquisition was made. It was reported on an SEC file. Right. Whether or not it was a feign or not of some sort. Well, what's the phrase? If the law is against you, if the facts are against you, scream at the bar. That's the point here, right? Even if you ignore his purchase, he had over 400,000 shares. He didn't sell a single one. Mr. Jogg, the CFO, had over 100,000 shares. Didn't sell. Didn't sell a penny. Now, the plaintiff's counsel says, well, you don't need to look at that because motive is not a scenic one-off. However, this Court has said that the absence of motive means that it's a higher burden, and there's a discussion of it in cases repeatedly. The Protonova v. Wainwright case, which we cited in our papers, talks about how the absence of motive means that the plaintiffs have to have even a greater burden because, as Your Honor, Judge Bybee noted in the Zucco case, the scientra inquiry is inherently comparative. The Supreme Court in the Telabs decision instructed courts that they have to consider negative and positive inferences. They have to consider incriminating inferences and exculpatory inferences. And here, the absence of stock sales has repeatedly been held by this Court to be a fact that goes toward negating scientra. Now, the plaintiffs say, well, ignore the fact that the defendants didn't sell any stock. The company was a small company. It needed cash. It would need to fund it in order to fund its operations. All right. But they didn't do an offering in the class period. The plaintiff does not allege that the company did a stock offering in the class period. On the contrary, their only allegation is that on March 18, a month and a half into the class period, the company filed a shelf registration statement. That's just a filing with the SEC that says that you can then subsequently later, using a prospective supplement, take shares off the shelf, so to speak, and sell them. But they didn't. So there are seven and a half more months in the class period after that shelf registration statement is filed. And the company didn't sell a single share. So, again, if they had tried to boost up the stock price artificially in order to take advantage of that temporary inflation, they did an awfully bad job of it, not selling any stock personally or the company taking advantage of it. That absence of motive is really fatal here, especially when you look at the absence of direct evidence or even more circumstantial evidence that the defendants knew that their forecasts were false. As I noted, in the first quarter, the company met its guides. In the second, it met its guides. In the third, it came up 2% short. Plaintiffs try to talk about a meeting that took place in October of 2018. So that's about three and a half months before the start of the class period. And there, there was apparently some discussion about how the back half of 2019, which was 8 to 14 months away, would be softer. But they don't give the numbers. They don't say, well, the forecast was X, and it also assumes something that's incongruous, which is that the company would be static for the next year and a half almost, 8 to 14 months, that it wouldn't try to get more sales, it wouldn't have any success in getting more sales, and that essentially the business would be static. The plaintiffs do not cite a single contemporaneous fact that says that the guidance given in any of the periods during the class period was false when made. Given that, the absence of motive, the absence of other indicia that could raise questions, like a financial restatement, like an SEC action, like something along those lines, reinforces the absence of scienter in this case. And so I think that Judge Hamilton gave the plaintiffs ample opportunity, as Judge Bennett, you noted. She held a hearing and then granted the initial motion to dismiss with leave to amend, issued a detailed order explaining how that first amended complaint came up short. Plaintiffs amended, but they didn't fundamentally change their case. They shrank it a little bit by taking out some of the statements that they were challenging, but the gist of it was essentially the same in the class period. The causes of action of the defendants were all the same. In the second go-around, Judge Hamilton held another hearing and granted the motion to dismiss, this time with prejudice. This was, as I said, the kind of case that the Reform Act was intended to end the pleadings, and the district court properly dismissed, and we would urge this court to affirm. I'm happy to answer any additional questions. I note that Appellate's counsel has argued that there were certain allegations of confidential witnesses who are listed as confidential witnesses who would address the lack of any plausible motive. Do you want to address that in any way? Absolutely, Your Honor. So they have two – several of their confidential witnesses are irrelevant now because they talk about the competition allegations which have been discarded by plaintiffs. There are two confidential witnesses that have any relevance, but they come far from meeting the standard that Judge Bivey's decision set in the Zucco case in terms of how such confidential witness allegations can negate a company's statements. Confidential witness number one is an administrative assistant marketing specialist who talks about a meeting that took place in Canada in October of 2018. Again, that's three and a half months before the start of the class period, and without giving any numbers says that the trend from 2016, 17, and 18, and 19 was showing up, but in the back half of 2019 it was showing down. That's not tied to any specific numbers, so we don't know what those trends compared to what the company's forecasts were. It also doesn't allege that this individual, CW1, had any role in the preparation of the forecasts or discussed it with Mr. Linthwide or Mr. Jager or with anybody else. So on the Zucco standard, it's a pretty weak claim there, and there are also some factual errors regarding to the extent that CW1 was saying that the company's revenue growth from 15, 16, 17, 18, et cetera, was positive. In fact, the company had a downturn in 16 and 17, and so just factually the predicate, if that's what this statement means, is incorrect. But again, CW1, this alleged meeting took place three and a half months before the start of the class period, and even if you take that at face value, it still fails because it doesn't say that the defendants agreed with it. So let's assume that all of that happened, and let's assume that this was discussed even many months later during the class period, and let's assume that the company's sales force decided to take the following year off. It still doesn't show that any statement was false when made, let alone made with Center, and there's a very good discussion of this issue in the WOCUS case where an employee tells the CEO that our plans are not achievable, and the court says, no, that's not good enough. You have to—it doesn't mean—a difference of opinion is not sufficient, and Judge Leiby's decision in the Zucco case has a very similar point where apparently there was a discussion about somebody having a doubt as to the company's accounting practices, and that raised this, but in that decision, the court said, but that's not sufficient to say that, in fact, the statements were false when made, or let alone with Center. In that case, actually, there was a financial restatement, the auditors resigned, et cetera, so there were additional—there were also stock sales. None of that is present here. So let me talk about CW number three for the nine seconds that I have left. CW number three is even less useful because CW number three apparently was— the implication is that he didn't like his quota. In July of 2018, he raised questions about the company's plan for 2019. So this is, again, six months before the end of 18, seven and a half months before the start of the class period, and again, apparently the issue was solely related to mass cytometry in North America. Over half of the company's sales are outside of North America and mass cytometry, although a growing business is only a part of the business, so it deals with much less than half of the company's business, and apparently he thought that the plan was unachievable. We don't know how that plan compared with the company's guidance. There's silence on that. And there's an additional point— That's over a minute if you want to wrap up. And CW three then changes his numbers for Q2, but, of course, the company achieved Q2, its guidance in Q2. Unless you have any questions. Thank you so much, Your Honor. Thank you, counsel. Mr. Eagle? Sir, I think you're on mute. Apologies. Thank you. Starting at the end in terms of the confidential witnesses, one confidential witness held weekly meetings with senior vice president of marketing in addition to providing information, all of which showed that sales were down, were losing, they were lagging sales. CW three also had quarterly views and periodic reviews with the defendants in which sales forecasts, they were reviewed every three weeks and provided to the individual defendants numbers showing that goals and sales were down. So it isn't just one or two instances of comparing the fact that the second half of 2019 would be down. There was continuous meetings and continuous information. Defendants had access to Salesforce. The defendants, individual defendants were said. Every win and loss was reviewed by the individual defendants. So I think that in terms of the confidential witnesses in there and the level of knowledge that they impute in this complaint, I think it's adequate to establish both the knowledge of the defendants that the second half of 2019 was going to be down and also in case. Counsel, what's your response to your colleague's point that they were only down 2% in Q3, so they didn't really know that those productions were wrong? Well, in Q3, they were down 2%. But in fact, first, Q3 being this is now the quarter in which essentially the truth emerges. They were down 20. Mass cytometry sales were down by 23%. And so the real growth driver was the part of the sales that were down, and that's what the public saw, and that's why the public reacted so adversely, because the public saw that the real driver was no longer there. So the 2% was a gross number, but it had nothing to do with the mass cytometry sales, which is what we've discussed. I do want to just touch on the issue of the sales. I do think we do allege that the purchase of 4,000 shares is a ruse. I think it's even more so should be considered as a ruse in light of the fact that Lymphoid had 400,000 shares. Buying 4,000 shares doesn't suggest to me any real confidence as much as it's a signal to the market that, in fact, I'm buying shares. So don't be as concerned as the truth when the truth starts to emerge. How much were those 4,000 shares worth, Tina, if you happen to know? About $32,000, I believe. Wait, yeah, that's right. It's about $8 a share. So that's my understanding. But in terms of overall sort of inferences that can be drawn from that, in conclusion, because my time's running out, I do think it's a holistic analysis. I think the court, the district court, while carefully reviewing and concluding that, in fact, accepting that we had pled falsity and that we had pled adequate information, concluded that holistically in the court's mind we hadn't pled enough because of the stock sales and because of the cash needs. I think the court, in reaching that result, discounted too greatly the fact that this was the growth sort of engine of the company, that it was the story that needed to be told to continue the growth of this company, and that concealing the truth wasn't intentional because ultimately what happened was when it was finally revealed, the company's stock price collapsed. It went from $12 ultimately down to $2.50. So I think that holistically, yes, you know, it doesn't have to be a better inference. Is it a reasonable inference? Even drawing, you know, drawing the sort of looking at it from both sides, it doesn't have to be the better inference. Counsel, you're over two minutes at this point if you want to wrap up. Thank you. I do. I do. Thank you very much, Your Honors. I appreciate it. Thank you, counsel. This case is submitted.
judges: BYBEE, BUMATAY, Bennett